# IN THE SUPREME COURT OF CALIFORNIA

In re THOMAS JOHN SPIELBAUER on Discipline.

S283172

Los Angeles State Bar Court
SBC-19-O-30700

July 16, 2026

Justice Evans authored the opinion of the Court, in which Chief Justice Guerrero and Justices Corrigan, Liu, Kruger, Groban, and Castillo[*] concurred.

---

[*] Associate Justice of the Court of Appeal, Fourth Appellate District, Division One, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

In re SPIELBAUER

S283172


Opinion of the Court by Evans, J.


In this case, we consider whether the Review Department of the State Bar Court (Review Department) properly concluded that attorney and respondent Thomas John Spielbauer (Spielbauer) should not be required to pay restitution for his acts of misconduct. The Review Department found Spielbauer culpable of four counts of misconduct, including failing to comply with Civil Code section 2943, committing two acts of moral turpitude by making misrepresentations, and failing to report a civil fraud judgment to the State Bar. For that misconduct, it recommended that Spielbauer be placed on probation for two years including actual suspension for the first six months of his probation. The Review Department concluded, however, that requiring payment of restitution would be inappropriate because the injured party was not a client of Spielbauer's, the nonclient's damages "arose due to causes of action based in tort," and under this court's precedents, "tort damages . . . cannot [be] use[d] as a justification to impose restitution."

We find that the Review Department misinterpreted our precedents and that a restitution order is appropriate in this case. We therefore order that Spielbauer make restitution in accordance with the terms set forth at the end of this opinion. We otherwise adopt the Review Department's recommended

discipline.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

In 2003, Spielbauer's brother, Dennis Spielbauer, obtained a $350,000 loan from Curtis Mitchell, a real estate investor.  The loan was secured by three of Dennis's properties, including one located at 167 E. William Street in San Jose, California (167 Property).  Because of a preexisting loan, Mitchell was in second position on the 167 Property.  Faramarz and Afsaneh Yazdani, as trustees of their family trust (Yazdani Trust), later assumed third position on that property in connection with a $210,000 loan secured by a deed of trust on the 167 Property and four other parcels.

In 2007, Dennis obtained a second loan from Mitchell.  That loan, in the amount of $585,000, was secured by Dennis's personal residence and two other properties, but not by the 167 property.

Dennis defaulted on both loans from Mitchell.  When Mitchell initiated foreclosure proceedings on Dennis's residence and the 167 Property, Dennis filed for bankruptcy.  By March 2010, the 167 Property was the only property Dennis still owned that secured the 2003 loan, and the outstanding balance on that loan was $7,152.03.

The first week of March 2010, Spielbauer incorporated Devine Blessings, Inc. (Devine Blessings).  Its purpose was to "secur[e] financing and purchase lien position notes, particularly on the properties of Dennis Spielbauer" that were "facing foreclosure."  Spielbauer identified himself as its president and "sole shareholder."  On March 12, 2010, less than two weeks before the foreclosure sales, Spielbauer, on behalf of Devine Blessings, agreed to purchase the 2003 and 2007 loans

from Mitchell for $126,000, in exchange for Mitchell's agreement to stop the foreclosure proceeding on Dennis's residence and to rescind the notice of default. The purchase agreement, which Spielbauer drafted, stated that the purchase was by "Thomas Spielbauer or the business entity he is an officer, director, or managing member of." At closing, Spielbauer refused to sign documents confirming that of the total purchase price, only $7,152.03 — which was the outstanding balance on the 2003 loan — related to the 167 Property, with the rest relating to the 2007 loan secured by Dennis's residence. He stated, "I don't need these," "I'm satisfied with the agreement we've already signed," and "I'm not signing them. I have my own reasons for not signing them. I can't tell you what they are, but they do not involve you." Mitchell, finding Spielbauer's behavior peculiar and disconcerting, documented Spielbauer's statements and had an escrow officer witness the documentation.

In late March 2010, after the purchase of the notes, the Yazdani Trust began foreclosure proceedings on the third deed of trust on the 167 Property. An agent for the Yazdani Trust subsequently purchased the property at a trustee's sale, with a newly formed company called 167 E. William, LLC (William LLC) taking title to the property. William LLC then sought to resell the property to a third party. In late April 2010, William LLC, after entering into an agreement to sell the property to a third party, asked Spielbauer for a payoff demand statement pursuant to Civil Code section 2943.[1] Spielbauer responded

---

[1] In 2010, when William LLC requested the payoff demand, Civil Code former section 2943, subdivision (c)(1) provided: "A beneficiary, or his or her authorized agent, shall, on the written demand of an entitled person, or his or her authorized agent,

with a written payoff demand of $269,500, comprising $126,000 for purchase of the 167 Property and $143,500 owed for unspecified "other" items. Spielbauer did not disclose that the actual outstanding balance on the loan secured by the 167 Property was only $7,152.03. He included in the "other" category almost $120,000 for attorney fees that Dennis incurred in trying to prevent foreclosure on his properties and in bankruptcy proceedings, about $70,000 of which was for legal services allegedly rendered by Spielbauer himself.

In May 2010, William LLC asked Spielbauer for an explanation or revision of the demand and for an accounting. Spielbauer failed to respond. Attorneys for William LLC then sent a letter to Spielbauer requesting a revised payoff demand and advising that the inflated payoff demand was jeopardizing the impending closing of the property's sale and thus exposing Spielbauer to civil liability for tortious interference. In a letter to William LLC's counsel dated May 28, 2010, Spielbauer stated that he was "responding . . . on behalf of Devine Blessings," that he "need[ed] to investigate the issues" William LLC had raised, that he had not had sufficient "time" to do so, and that he would "respond on . . . the next business day," June 1, 2010. Spielbauer wrote the letter on letterhead of his law firm — "The Spielbauer Law Office" — and identified himself on the typed signature line as "Thomas Spielbauer, Esq." He never subsequently provided either an accounting or an explanation. As a result, William LLC canceled the sale, refunded the third-

---

prepare and deliver a payoff demand statement to the person demanding it within 21 days of the receipt of the demand." (Stats. 2009, ch. 43, § 5.) Identical language appears in subdivision (c) of the current version of the statute, which became operative on January 1, 2014.

party buyer's deposit, and reimbursed the buyer for additional costs incurred.

In July 2010, William LLC filed a complaint against Devine Blessings that included causes of action for declaratory relief, violation of Civil Code section 2943, and interpleader. In February 2011, after extensive demurrer proceedings, William LLC filed a second amended complaint adding Spielbauer as a defendant and alleging causes of action for declaratory relief, intentional interference with economic advantage, negligent interference with economic relations, and violations of Civil Code section 2943. The complaint sought damages based on Spielbauer's alleged proffer of an inaccurate payoff demand statement for the 167 Property. In April 2013, the court, after a bench trial, allowed William LLC to add (by amendment of the complaint) a cause of action for slander of title and ruled that William LLC had proven its claims for slander of title, intentional interference with economic advantage, and negligent interference with economic relations. It found that Spielbauer's payoff demand was inaccurate and violated Civil Code section 2943. It also found that "[t]he evidence compel[led]" the following conclusions: (1) Spielbauer "knew [the demand] to be false, fully appreciating that [it] would" force William LLC to pay the amount of the demand "as ransom" if it wanted the sale of the property to go through; and (2) providing the knowingly false demand was Spielbauer's "attempt to force [William LLC] to pay the unrecoverable attorney fees for Dennis Spielbauer's bankruptcy" and "to reimburse [himself] for paying off the loan on his brother's residence — even though that loan had nothing to do with the [167] Property." Based on these conclusions, the court also found "by clear and convincing evidence" that Spielbauer's "acts were fraudulent within the

meaning of" the punitive damages statute (Civ. Code, § 3294).

The court rejected Spielbauer's claim that he believed his payoff demand was justified by the deed of trust on the property and an "agreement" between himself and Dennis, entered into after he "bought the Mitchell note," that "modif[ied] the note to include" the claimed "additional sums." The only evidence of the alleged modification, the court explained, was Spielbauer's own "self-serving" testimony because Spielbauer had: (1) "failed to" present "the written [modification] document itself" despite having "had the opportunity to . . . do so"; and (2) "withheld" the document "during discovery" despite "admit[ting] that it was not privileged." In the court's view, because Spielbauer did not produce the written agreement or "provide any explanation . . . as to *how* the note was supposedly modified," "[t]here was simply no evidence" to provide "a factual basis" for the conclusion "that the note had been modified." Instead, the court found, the payoff demand was simply an attempt to "shift" to William LLC "the financial burden" of both Spielbauer's work on Dennis's bankruptcy proceedings and the $126,000 payment to Mitchell.

In February 2014, the superior court entered judgment in favor of William LLC, and against both Spielbauer and Devine Blessings, for a total amount of $869,276.55, comprising $332,547.06 in compensatory damages on the claim for slander of title — which included a $7,152.03 reduction for the amount still owed on the 167 Property — $163,597.12 in attorney fees, $40,582.37 in costs, and $332,550 in punitive damages. In 2016, the Court of Appeal affirmed the judgment and we denied Spielbauer's petition for review.

In April 2014, about two months after entry of judgment

in the civil action, Spielbauer filed for bankruptcy. Three months later, in July 2014, William LLC filed an adversary complaint in the bankruptcy matter requesting a determination that the debt arising from the judgment in the civil action was not dischargeable because it was based on "fraudulent" acts by Spielbauer. After William LLC filed an amended complaint seeking the same relief, Spielbauer filed an answer that personally attacked Faramarz Yazdani, alleging that Yazdani was a "hard money, predatory lender[]" who had "loot[ed]" and "savag[ed]" Dennis through "dishonest and fraudulent actions" that resulted in Dennis's "mental and physical breakdown." The answer also asserted, among other things, that under California case law, Spielbauer's payoff demand was "justified" by the terms of the operative deed of trust for the property and a subsequent "modification" agreement with Dennis. In April 2017, the bankruptcy court, giving collateral estoppel effect to the superior court's findings in the civil action, granted William LLC summary judgment on its adversary complaint and entered a judgment stating that the civil judgment "is excepted from discharge" and the "debt" arising from it "is non-dischargeable." A federal district court affirmed the bankruptcy court's judgment in March 2018, reasoning that the bankruptcy court had not abused its discretion in giving preclusive effect to the findings in the civil action. In November 2019, the Ninth Circuit Court of Appeals, also giving collateral estoppel effect to the findings in the civil action, affirmed the orders of the federal district court and the bankruptcy court, concluding that Spielbauer: (1) "committed fraud by intentionally misrepresenting a material fact known to him with the intention of injuring" William LLC; and (2) "inflicted" a "malicious," "deliberate[,] and intentional injury . . . with the actual,

subjective motive and intent to cause the injury." Spielbauer has never made any payment on the judgment.

In June 2014, about four months after entry of judgment in the civil action and two months after Spielbauer filed for bankruptcy, an investigator for the Office of Chief Trial Counsel of the State Bar (OCTC) contacted Spielbauer about the civil fraud judgment in the William LLC matter. The investigator stated that OCTC had no record of Spielbauer reporting the judgment as required by section 6068, subdivision (*o*)(2) of the Business and Professions Code. In a written response dated July 11, 2014, Spielbauer stated that the judgment was not "reportable" because the "activities" giving rise to it were not " 'committed in a professional capacity' " — i.e., "as an attorney" — but "as a President of" Devine Blessings.

On December 16, 2019, OCTC filed a Notice of Disciplinary Charges alleging five counts of misconduct by Spielbauer: (1) violating section 6068, subdivision (a) of the Business and Professions Code by failing to comply with Civil Code section 2943; (2) violating section 6068, subdivision (a) of the Business and Professions Code by committing fraud within the meaning of Civil Code section 3294; (3) violating section 6106 of the Business and Professions Code by committing two acts of moral turpitude (misrepresentation); and (4) violating section 6068, subdivision (*o*)(2) of the Business and Professions Code by failing to report the civil fraud judgment. The State Bar hearing judge found Spielbauer culpable on all but the last count (failure to report the judgment) and recommended a two-year suspension with execution stayed and probation for two years with various conditions, including actual suspension for the first 90 days of the probationary term. The hearing judge declined to recommend that Spielbauer be required to make restitution,

citing the following factors: (1) "it has not been established that Spielbauer's wrongdoing occurred in the practice of law"; (2) William LLC was "not a client" and could avail itself of "other mechanisms . . . to satisfy [the civil] judgment" it had obtained; (3) "Spielbauer's conduct merits a modest level of discipline — a 90-day suspension"; and (4) requiring him to pay "nearly one million dollars" in restitution "prior to returning to active status . . . would undoubtedly have a far greater impact on his ability to practice than intended."

Both Spielbauer and OCTC appealed, with OCTC asking for a finding of culpability on all five counts and, in terms of discipline, actual suspension for six months "and until he pays restitution." The Review Department found Spielbauer culpable of only four counts: failing to comply with Civil Code section 2943, two acts of moral turpitude by making misrepresentations, and failing to report the civil fraud judgment. For discipline, it recommended that Spielbauer "be suspended from the practice of law for two years, that execution of that suspension be stayed, and that he be placed on probation for two years" subject to various conditions, including actual suspension "for the first six months of his probation." Among the factors the Review Department cited in increasing the recommended length of the actual suspension were the following: (1) Spielbauer's "misrepresentation to William LLC jeopardized its right to sell the 167 Property and was an attempt to defraud the company out of" approximately $262,000; (2) his "misconduct in the superior court" — "submit[ing] to the judge" a declaration "containing" an intentional "misrepresentation regarding the payoff demand" — was "related to the practice of law"; and (3) "his substantial indifference" regarding the consequences of his misconduct, his "failure to pay the civil

judgment," and "[h]is failure to understand the wrongfulness of his misconduct."

The Review Department "decline[d] to recommend [that] Spielbauer be ordered to make restitution to William LLC." After noting that William LLC was "a non-client entity," the Review Department, quoting our decision in *Sorensen v. State Bar* (1991) 52 Cal.3d 1036 (*Sorensen*), stated that this court "has explicitly stated that restitution in the disciplinary context is not a 'damage award'" and "does not 'approve imposition of restitution as a means of compensating the victim of wrongdoing . . . .'" Although acknowledging decisions in which we had ordered restitution to compensate nonclients, the Review Department found those decisions "distinguishable."

On OCTC's motion for reconsideration, the Review Department affirmed its decision not to recommend restitution, stating: "The restitution OCTC seeks in this case constitutes a damages award based in tort, with a substantial portion of the award — the punitive damages portion — exceeding out-of-pocket losses, to a business entity to whom [Spielbauer] had no fiduciary duty. This is beyond the scope of every disciplinary case in which restitution has been imposed and that involved parties outside the attorney-client relationship. . . . [¶] OCTC contends that because this case does not involve an ordinary tort, but rather, a tort in fraud, restitution must be imposed as part of discipline, overlooking that the fraud [Spielbauer] committed was the basis for the punitive damages award, which is clearly beyond the reach of *Sorensen's* restitution for out-of-pocket losses in a limited situation. [Citation.] OCTC draws a comparison to misconduct involving moral turpitude as justification for requiring restitution, but that is of no help. We previously considered a case that involved misconduct

constituting moral turpitude and we declined to impose restitution as the underlying superior court judgment was comprised of tort damages. (*In re Torres* (Review Dept. 2000) 4 Cal. State Bar Ct. Rptr. 138, 152-153.)"

OCTC petitioned for review, raising the following questions: "In attorney disciplinary cases involving harm to a non-client, should restitution be precluded simply because the attorney's misconduct is grounded in tort? And, in this attorney disciplinary case, should Respondent be ordered to pay restitution to a non-client for specific out-of-pocket losses incurred as a direct result of Respondent's intentional and fraudulent misconduct." We granted the petition.[2]

## II. DISCUSSION

### A. *Sorensen* and other precedents.

"The basic objectives of attorney discipline are the protection of the public, the preservation of confidence in the legal profession, and the rehabilitation of errant attorneys where appropriate." (*Bach v. State Bar* (1991) 52 Cal.3d 1201, 1206 (*Bach*).) Thus, "in imposing discipline, we do not simply impose retribution and punishment, but seek to protect the public, to preserve public confidence in the legal profession, and to maintain and enforce the highest possible professional standards for members of the bar." (*Coppock v. State Bar* (1988) 44 Cal.3d 665, 684 (*Coppock*).) To accomplish these goals "and at the same time to rehabilitate the errant attorney" (*Brookman*

---

[2] Spielbauer filed a separate petition for review raising numerous issues. We denied his petition. Thus, the only aspect of the Review Department's recommendation here at issue is its conclusion that ordering Spielbauer to make restitution would be improper.

*v. State Bar* (1988) 46 Cal.3d 1004, 1008 (*Brookman*)), we have " 'the power to impose discipline [that] encourages attorneys to act honestly and with integrity.' " (*Coppock*, at p. 685.)

Included within this power is the authority to order restitution. Indeed, as we have explained in the attorney discipline context, "[r]estitution *is fundamental* to the goal of rehabilitation." (*Hippard v. State Bar* (1989) 49 Cal.3d 1084, 1094, italics added.) "[I]mposed as a condition of probation," restitution "serves the state interest of rehabilitating culpable attorneys (and protecting the public) by forcing the attorney to 'confront, in concrete terms, the harm [their] actions have caused.' " (*Brookman, supra*, 46 Cal.3d at p. 1009; see *Bach, supra*, 52 Cal.3d at p. 1207 ["Ordering restitution in cases of financial injury is a rehabilitative measure designed to further the state's disciplinary objectives 'by forcing [attorneys] to "confront, in concrete terms, the harm [their] actions [have] caused" ' "].) For this reason, in the attorney discipline context, "[r]estitution is routinely required . . . in cases of misappropriation of client funds," "usually without discussion." (*Coppock, supra*, 44 Cal.3d at p. 684.)

However, as we have explained, "[i]t does not follow . . . that restitution is appropriate only in" cases involving misappropriation of client funds, or that attorneys who do not misappropriate client funds "should not be required to pay restitution to the victims of [their] culpable acts. [¶] Although part of the rationale for requiring restitution may be to prevent . . . attorney[s] from profiting from [their] wrongdoing, restitution is also intended," among other things, "to discourage dishonest and unprofessional conduct." (*Coppock, supra*, 44 Cal.3d at p. 685.) In this regard, requiring a disciplined attorney to pay restitution "is clearly for the benefit of the public at large"

and does not function "merely [as] compensation to the [victim] for 'actual pecuniary loss.' " (*Brookman, supra,* 46 Cal.3d at p. 1009.)

We applied these principles in *Sorensen,* which was the linchpin of the Review Department's analysis. There, attorney Baldwin, after taking a deposition and obtaining a transcript from the business entity for which the reporter worked — "a deposition reporting firm" called "the Los Angeles Court Reporters" — decided that the "bill [for the transcript] was excessive" and convinced his client to pay only about half. (*Sorensen, supra,* 52 Cal.3d at p. 1038.) To recover the rest, the owner of the reporting firm — Ms. Brigante — "filed a small claims action against" Baldwin. (*Id.* at p. 1039.) In response, attorney Kerry Sorensen filed on Baldwin's behalf "a municipal court [action] against Brigante . . . for 'fraud and deceit.' " (*Ibid.*) After dismissal of the fraud action on summary judgment, a State Bar hearing panel found in a disciplinary proceeding that Sorensen, by filing the action, had " 'willfully violated' " his " 'oaths and duties as' " an attorney and had " 'abused and misused the process of the court.' " (*Id.* at p. 1040.) The panel recommended that Sorensen "be required to reimburse Brigante's legal fees and expenses" in defending against the action. (*Ibid.*) The Review Department deleted this recommendation, reasoning: " '[S]uch reimbursement would be an award of damages rather than restitution. The Review Department has declined to adjudicate or to award damages in attorney disciplinary proceedings.' " (*Id.* at pp. 1040–1041.)

"Exercising our independent judgment" (*Sorensen, supra,* 52 Cal.3d at p. 1045), we sided with the hearing panel and concluded that a restitution award was appropriate. After explaining that "the sanction" for the misconduct "must

13

reflect . . . the harm" it caused (*id.* at p. 1044), we added: "Unlike the review department, we do not view restitution in this context as a 'damage award.' Nor do we approve imposition of restitution as a means of compensating the victim of wrongdoing. [Citation.] Rather, we consider restitution a necessary condition of probation designed to effectuate [the attorney's] rehabilitation and to protect the public from similar future misconduct. Although most of our previous cases requiring restitution as a condition of probation have involved misuse of client funds [citations] and unearned fees [citations], we believe the same protective and rehabilitative principles apply in the case of a party who has been forced to incur legal fees as a result of an attorney's violation of [Business and Professions Code] section 6068, subdivisions (c) and (g). In both instances, private persons have incurred specific out-of-pocket losses directly resulting from attorney misconduct. Restitution of these amounts emphasizes the professional responsibility of lawyers to account for their misconduct, and thereby serves to both protect the public and instill public confidence in the bar." (*Id.* at pp. 1044–1045.)

As earlier noted, the Review Department read this passage from *Sorensen* as an "explicit[] state[ment] that restitution in the disciplinary context is not a 'damage award' " and as our disapproval of imposing restitution " 'as a means of compensating the victim of wrongdoing.' " Based on this reading, the Review Department reasoned that "a civil judgment in tort . . . cannot serve as the basis for restitution" because recovery in tort constitutes a damage award to *compensate* for injury. And because the "civil judgment [against Spielbauer] was primarily driven by tort damages," under *Sorensen*, it "cannot [be] use[d] as a justification to impose

restitution." The restitution order in *Sorensen*, the Review Department declared, constituted only "a limited exception" — based on "the unique facts of [that] case" — to the rule against ordering restitution as compensation, which had "extended the 'protective measures and rehabilitative principles' of restitution to compensate" a nonclient for legal fees incurred *only* in "defending" against a lawsuit and *only* when the attorney's conduct constitutes a "violation of [Business and Professions Code] section 6068, subdivisions (c) and (g)." That exception does not apply here, the Review Department concluded, because "Spielbauer was not found culpable of violating section 6068, subdivisions (c) and (g), and the restitution amount comprising attorney fees and costs arose from William LLC successfully suing Spielbauer, rather than from William LLC defending itself in a lawsuit."

We conclude that the Review Department has misread *Sorensen* and our other precedents. Contrary to the Review Department's analysis, our order of restitution in *Sorensen* did not rest on the fact that the attorney in that case had violated subdivisions (c) and (g) of Business and Professions Code section 6068, *specifically*. Nor did it rest on the fact that the funds to be reimbursed had been incurred in "defending" against a lawsuit brought by the attorney, rather than in "suing" the attorney. We reasoned more generally that "the same protective and rehabilitative principles" that warrant a restitution order when attorney misconduct "involve[s] misuse of client funds [citations] and unearned fees" more broadly "apply" *whenever* "private persons have incurred specific out-of-pocket losses directly resulting from attorney misconduct." (*Sorensen, supra,* 52 Cal.3d at pp. 1044–1045.) As we went on to explain, "[r]estitution of these amounts" — i.e., "specific out-of-pocket

losses directly resulting from attorney misconduct" — "emphasizes the professional responsibility of lawyers to account for their misconduct, and thereby serves to both protect the public and instill public confidence in the bar." (*Id.* at p. 1045.) Requiring payment of restitution serves these same "protective and rehabilitative" goals even when the misconduct does not involve a violation of the particular statute at issue in *Sorensen* — section 6068, subdivisions (c) and (g) — and even when the legal fees "result[ing]" from the attorney's misconduct were "incur[red]" by the victim in suing the attorney rather than in defending against a meritless lawsuit brought by the attorney. (*Sorensen*, at pp. 1044–1045.)

Our comments in *Sorensen* about "restitution as a means of compensating the victim" or "as a 'damage award' " (*Sorensen*, *supra*, 52 Cal.3d at p. 1044) must be understood in context. Our point was not, as the Review Department concluded, that an award of restitution is impermissible insofar as it "compensat[es] the victim of wrongdoing." (*Ibid.*) Rather, it was that the primary purposes of ordering "restitution [as] a necessary condition of probation" in attorney discipline cases are "effectuat[ing]" the attorney's "rehabilitation and . . . protect[ing] the public from similar future misconduct," and that compensating the victim through an "award [of] restitutive monetary relief" is permissible "when doing so is 'merely incidental to' " these " 'proper, primary . . . purpose[s].' " (*Id.* at p. 1044.) By "emphasiz[ing] the professional responsibility of lawyers to account for their misconduct," requiring attorneys to pay for "specific out-of-pocket losses directly resulting from [their] misconduct . . . serves to both protect the public and instill public confidence in the bar." (*Id.* at p. 1045.) This reading of *Sorensen* is fully consistent with our

statement in *Brookman* — which we cited in *Sorensen* — that requiring payment of restitution "fundamentally serves the [broader] goal of rehabilitation" and therefore "is not *merely* compensation . . . for 'actual pecuniary loss.' "[3] (*Brookman*, *supra*, 46 Cal.3d at p. 1009, italics added; see *Kwasnik v. State Bar*, (1990) 50 Cal.3d 1061, 1073, quoting *Brookman*, at p. 1009.)

Amicus curiae Lawyers' Mutual Insurance Company (Lawyers' Mutual) argues that ordering restitution in this case would "cross the bright line between damages and restitution drawn in *Sorensen*." It "is well-established in the law," Lawyers' Mutual asserts, that " '[t]he object of restitution is to restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest.' [Citations.] . . . [I]t 'is designed to restore the aggrieved party to his or her former position by return of the thing or its equivalent in money' " and "has 'primarily been utilized by courts to prevent unjust enrichment' by forcing a wrongdoer to disgorge ill-gotten gains." It is both "distinct from" and " 'fundamental[ly] differen[t]' " than damages, in that it " 'is measured by the defendant's gain' " whereas damages are " 'measured by the plaintiff's loss.' " "Put

---

[3]  In several decisions, the Review Department has cited *Sorensen* for the proposition that an order requiring an attorney to pay tort damages as restitution is impermissible. (*In the Matter of Torres* (Review Dept. 2000) 4 Cal. State Bar Ct. Rptr. 138, 153 ["we do not construe *Sorensen* as extending restitution to cover tort damages"]; *In the Matter of Bach* (Review Dept. 1991) 1 Cal. State Bar Ct. Rptr. 631, 650 ["It is inappropriate to use restitution as a means of awarding unliquidated tort damages for malpractice"].) We disapprove these decisions to the extent they indicate that a restitution order requiring an attorney to pay a victim's losses is improper solely because those losses may constitute damages in tort.

simply, the traditional definition of restitution is A returning a res to B that was improperly taken from B in the first instance. It is not a substitute for traditional monetary damages." It does not include " ' "[c]ompensation for a lost business opportunity," ' " which " ' "is a measure of damages." ' " According to Lawyers' Mutual, "[c]ourts apply this . . . core definition of restitution in many contexts" and "[t]his court's cases imposing restitution as a condition of professional discipline have largely adhered to [this] traditional definition." Lawyers' Mutual asserts that although the court has "departed from traditional restitution" in several disciplinary decisions — including *Sorensen* — ordering restitution in this case would "represent[] a greater departure from traditional restitution than" those decisions.

As previously discussed, in *Sorensen*, we did not, as Lawyers' Mutual argues, draw a "bright line between damages and restitution." Rather, we held that when "attorney misconduct" causes "private persons" to incur "specific out-of-pocket losses," a restitution award is proper, and that "compensating the victim of wrongdoing" through an "award [of] restitutive monetary relief" is permissible "when doing so is 'merely incidental to a proper, primary . . . purpose' " of imposing discipline. (*Sorensen, supra*, 52 Cal.3d at pp. 1044–1045.) "[I]n this context," we "view" restitution, not as "a 'damage award,' " but as "a necessary condition of probation designed to effectuate [the attorney's] rehabilitation and to protect the public from similar future misconduct." (*Id.* at p. 1044.) "[F]orcing" wayward attorneys, through payment of restitution, "to 'confront, in concrete terms, the harm [their] actions have caused' . . . fundamentally serves the goal of rehabilitation." (*Brookman, supra,* 46 Cal.3d at p. 1009.)

Lawyers' Mutual fails to adequately consider the purposes of restitution *in this context* when it argues we should strictly apply what it asserts is the "core definition of restitution" that "[c]ourts apply . . . in many [other] contexts." (Cf. *Walnut Creek Manor v. Fair Employment & Housing Com.* (1991) 54 Cal.3d 245, 263 ["[r]estitutive damages," which agencies may award when reasonably necessary to effectuate their primary, legitimate regulatory purposes, include "economic harm suffered by one party in consequence of another party's violation of a law," i.e., "quantifiable amounts of money . . . to compensate for the pecuniary loss directly resulting from" a "violation of law"].)

Lawyers' Mutual also misreads some of the other decisions on which it bases its argument. In *Slavkin v. State Bar* (1989) 49 Cal.3d 894, 898 (*Slavkin*), we imposed discipline — including payment of restitution — on an attorney for, as relevant here, "wilfully fail[ing] to . . . perform any services" for a client after being retained, and paid an "advance," "to take prompt action to evict a nonpaying tenant." (Fn. omitted.) According to Lawyers' Mutual, our discipline order in *Slavkin* "adhered to the traditional definition of restitution" by "condition[ing]" the attorney's suspension "on repayment of misappropriated client funds," i.e., the prepaid legal fee. However, the "items of restitution" in our restitution order included "the full amount of [a] judgment" the client had obtained against the attorney in "[s]mall [c]laims [c]ourt" (*Slavkin,* at p. 906), and that judgment required the attorney to pay, *in addition to* "the prepaid [legal] fee," an amount "representing *rental losses incurred by* [*the attorney's*] *inaction*" (*id.* at p. 898, italics added). Thus, *Slavkin*, although cited by Lawyers' Mutual, actually supports a

conception of restitution that is broader than the restricted one Lawyers' Mutual offers and not limited to out-of-pocket losses.

The Review Department, in addition to its mistaken view of *Sorensen*, relied on the fact that William LLC has never been Spielbauer's client. However, its analysis is inconsistent with decisions of this court that the Review Department acknowledged but declared to be "distinguishable."

One of those decisions is *Galardi v. State Bar* (1987) 43 Cal.3d 683, 687 (*Galardi*), where we imposed discipline — including payment of restitution — based on an attorney's "willful[] breach[]" of "fiduciary duties he owed," *not to his clients*, but "to his joint venturers in various real estate investment projects." Although noting that "the misconduct occurred in the course of [the attorney's] business dealings and not during his representation of legal clients" — and citing this as a reason for reducing the terms of the suspension the Review Department had recommended — we nonetheless adopted the Review Department's recommendation that the attorney be required to pay, over a five-year period, restitution to "his coventurers" in the total amount $186,000. (*Id.* at p. 694.)

The Review Department's rationale for distinguishing *Galardi* — it involved an attorney who "breached his . . . fiduciary duty and diverted funds or misappropriated money owed to a non-client" — is not supported by our precedents. In *Sorensen*, which we have already discussed, we ordered payment of restitution even though the attorney had no fiduciary duty to the owner of the deposition firm and had neither diverted nor misappropriated money owed to her. *Coppock*, which the Review Department did not discuss in connection with this issue, involved similar facts. There, the disciplined attorney "allowed a client to use his client trust

account in a scheme to *defraud the client's creditors*" (*Coppock*, *supra*, 44 Cal.3d at p. 670, italics added), whom the attorney had "never represented . . . in any capacity" and with whom he "had no fiduciary relationship" (*id.* at p. 673). The attorney's "conduct," we concluded, "warrant[ed] discipline" even though "it did not harm his clients" (*id.* at p. 683) and the attorney "did not specifically intend to defraud" his client's victims (*id.* at p. 684). "When . . . attorney[s] violate[] [their] professional duties," we explained, "disciplinary measures may be appropriate even absent any intentional dishonesty." (*Ibid.*) We adopted the Review Department's recommendation that the attorney be required to pay restitution to his client's victims, notwithstanding that he had neither "misappropriate[d] client funds" nor otherwise "profit[ed] from his wrongful conduct." (*Id.* at pp. 684–685.) The restitution requirement, we explained, would "not only protect the public, but [it would] also serve to further the integrity of the profession and encourage high professional standards of conduct." (*Id.* at p. 685) Given *Sorensen* and *Coppock*, the Review Department's view that Spielbauer breached no fiduciary duty to William LLC and neither diverted funds nor misappropriated money owed to William LLC does not provide a persuasive basis for distinguishing *Galardi*.[4]

*In re Morse* (1995) 11 Cal.4th 184 (*Morse*) is the last of our decisions involving payment of restitution to a nonclient that

---

[4] Notably, the Review Department itself has ordered payment of restitution on facts analogous to those in *Galardi*. (*In the Matter of McCarthy* (Review Dept. 2002) 4 Cal. State Bar Ct. Rptr. 364, 385 [ordering actual suspension of attorney who misappropriated funds of his partner in a land partnership until payment of restitution to partner].)

the Review Department acknowledged but considered distinguishable. There, the attorney faced discipline for "mail[ing] to the public approximately four million . . . unlawful, misleading advertisements" that offered his "assistance in the filing of homestead declarations." (*Id.* at pp. 189–190.) In a separate civil enforcement action based on the same conduct, a superior court ordered the attorney "to pay $400,000 in" restitution, not to those who had paid money in response to the advertisements or who had a fiduciary relationship with the attorney, but "to the Consumer Protection Prosecution Trust Fund." (*Id.* at p. 193.) By stipulation of the parties, the amount of "restitution to [be paid to] the Consumer Protection Prosecution Trust Fund" was reduced to $170,000, on condition that the attorney "make any required payment within 120 days of its due date." (*Id.* at p. 194.) In the related disciplinary matter, "[t]he State Bar hearing judge recommended as an explicit condition of probation that [the attorney] pay $400,000 in restitution." (*Id.* at p. 210.) The Review Department "deleted" this condition from its recommendation (*id.* at p. 198), reasoning that it was "redundant of the superior court judgment requiring restitution" because that judgment "already had imposed that sanction" (*id.* at p. 210). Although noting that the Review Department was "[p]erhaps" correct "as a technical matter," we adopted the hearing judge's recommendation and imposed the requirement that the attorney pay "restitution pursuant to the terms" of the stipulation in the civil enforcement action. (*Ibid.*) "[D]oing so," we explained, "will eliminate any possible future argument by [the attorney], if the situation should arise, that the probation condition has not been violated unless there is a further court order finding such violation. The making of the payments an explicit condition of probation will

allow the State Bar to take whatever action may be appropriate, independent of further civil court action." (*Id.* at pp. 210–211.)

*Morse*, the Review Department declared in this case, is "distinguish[able]" because the civil enforcement action there at issue, unlike William LLC's action, "was not one based in tort" and the " 'primary purpose' " of the "civil money penalties[]" sought in that enforcement action, "[u]nlike tort damages," was " 'to secure obedience to statutes and regulations.' " In other words, the Review Department reasoned, the restitution ordered in *Morse* was "meant" not "to directly compensate victims of *Morse*'s misconduct" but "to benefit the public generally." It "was a form of equitable relief as opposed to damages based on the individual harm to each victim," whereas William LLC's "civil judgment [against Spielbauer] was primarily driven by tort damages," which, "per *Sorensen*," "cannot [be] use[d] as a justification to impose restitution."

The Review Department's rationale for distinguishing *Morse* rests on the same misreading of *Sorensen* earlier discussed. *Sorensen*, properly understood, does not stand for the proposition that a restitution award may not in any respect function like "tort damages" by compensating the victim "based on the individual harm to [the] victim." It stands for the proposition that, in the attorney discipline context, any compensatory aspect of a restitution award "is 'merely incidental to' " the primary purposes of such an award: "effectuat[ing]" the attorney's "rehabilitation," "protect[ing] the public from similar future misconduct," and "instill[ing] public confidence in the bar." (*Sorensen, supra*, 52 Cal.3d at pp. 1044–1045.) And that proposition rested on our conclusion that the "protective and rehabilitative principles" warranting restitution for misuse of client funds and unearned fees "apply" broadly

whenever "private persons have incurred specific out-of-pocket losses directly resulting from attorney misconduct." (*Ibid.*)

*Brookman*, which the Review Department did not mention, is analogous to *Morse*. There, we disciplined an attorney for, among other things, failing to repay funds a client had provided as a loan, rather than for legal services. (*Brookman*, *supra*, 46 Cal.3d at pp. 1006–1007.) As here relevant, we ordered payment of restitution to the State Bar Client Security Fund, which had paid the client the outstanding amount of the loan. (*Id.* at pp. 1007–1009.) We explained that payment of restitution, by "forcing the attorney to 'confront, in concrete terms, the harm his actions [had] caused,'" would "fundamentally serve[] the goal of rehabilitation" and was "not merely compensation to the government for 'actual pecuniary loss.'" (*Id.* at p. 1009.)

Notably, this is precisely how the Review Department itself has twice read *Sorensen* in concluding that attorneys should be required to pay restitution to nonclients based on damages for the tort of fraud. In *In the Matter of Katz* (Review Dept. 1995) 3 Cal. State Bar Ct. Rptr. 430, an attorney, in connection with his client's purchase of a manufacturing company, "lied" to the sellers "when he endorsed [his client's] false financial statement" knowing "it was false and grossly exaggerated." (*Id.* at p. 434.) After the transaction closed, the company "became insolvent," the client filed for bankruptcy, and one of the sellers obtained from the bankruptcy court "a nondischargeable judgment against" the attorney — "in the amount of $8,038.04" — on a "fraud claim" alleging that the attorney, along with his client, "defrauded" the seller "by giving him the false financial statement." (*Id.* at pp. 434–435.) In a disciplinary action, the Review Department "conclude[d] that

[the attorney] should be required to make restitution of the $8,038.04 judgment." (*Id.* at p. 440.) Citing *Sorensen* and *Brookman*, the Review Department explained: "Restitution is a method of protecting the public and rehabilitating errant attorneys because it forces an attorney to confront the harm caused by his misconduct in real, concrete terms. [Citations.] Without question, sanction orders are for specific out-of-pocket losses directly resulting from [the attorney's] misconduct and, therefore, proper subjects of a restitution order." (*Ibid.*)

Six years later, in *In the Matter of Petilla* (Review Dept. 2001) 4 Cal. State Bar Ct. Rptr. 231 (*Petilla*), the Review Department similarly relied on *Sorensen* and *Brookman* as authority for awarding restitution to a nonclient in the amount of damages caused by the attorney's fraud. The attorney obtained cash advances on credit cards "without intending to repay them," "used and lost those cash advances while gambling," and "[a]lmost immediately" afterwards "attempted to discharge the debts in bankruptcy." (*Id.* at p. 236.) In the bankruptcy proceeding, the court, based on its finding that the attorney's conduct constituted "actual fraud," "entered a judgment declaring [the attorney's] debts to [the credit card company] nondischargeable." (*Id.* at p. 240.) In a disciplinary proceeding involving the same conduct, the Review Department found that the attorney had committed " 'act[s] of dishonesty' " (*id.* at p. 241) and it concluded he should "be required to make restitution to" the credit card company in the amount of the unpaid advances (*id.* at p. 248). Citing *Brookman* and *Sorensen*, the Review Department reasoned that payment of restitution was neither "a form of debt collection" nor "a means of compensating the victim of wrongdoing," but was an "appropriate," "necessary," and "important part of rehabilitation

and public protection," in that it would "force[]" the attorney "to confront, in concrete terms, the harm that [his] misconduct ha[d] caused." (*Petilla*, at p. 248.) Consistent with our earlier discussion, the Review Department's decisions in *Petilla* and *In the Matter of Katz* — rather than its decision in this case, which mentioned neither of those earlier decisions — represent correct applications of our restitution jurisprudence in general and our *Sorensen* decision in particular.

We note one last decision demonstrating that under our precedents, William LLC's nonclient status is not a basis for declining to order Spielbauer to make restitution. In *Frazer v. State Bar* (1987) 43 Cal.3d 564, 566 (*Frazer*), we disciplined an attorney for acts of misconduct in connection with several loans he had obtained. Two of those loans were "from a nonclient" (*ibid.*) — Marcy McCann — who had learned through a mutual friend that the attorney needed "money to use in a real estate development." (*Id.* at pp. 572–573.) In obtaining these loans, the attorney "knowingly and intentionally misrepresented to McCann that she was to receive a second deed of trust when in fact there were already two deeds of trust against his residence." (*Id.* at p. 573.) As part of a five-year probation period, we ordered the attorney's actual suspension "during the first 18 months of said period . . . and until he [made] restitution to" the nonclient for the amount she lent him "plus interest at the legal rate from" the date of the first loan.[5] (*Id.* at p. 580.) The Review Department's emphasis, in declining to recommend payment of

---

[5] Our order of discipline in *Frazer* also provided that the attorney's actual suspension would continue "until he makes restitution" — including "interest at the legal rate" — to several *clients* for money they had given him as a personal loan rather than for legal services. (*Frazer*, *supra*, 43 Cal.3d at p. 580.)

restitution, on the fact that William LLC was never one of Spielbauer's clients is inconsistent with this decision.

## B.  Spielbauer's remaining arguments.

Spielbauer offers several other arguments in support of his claim that a restitution order in this case would be improper. One of those arguments, which he makes for the first time in this court, is that the judgment in the William LLC matter "has now expired."  Under Code of Civil Procedure sections 683.020 and 683.130, he reasons, a judgment expires and becomes unenforceable unless renewed within 10 years of its entry.  The judgment in the William LLC action was entered on February 20, 2014, and was not renewed "as of February 20, 2024." Therefore, it "is no longer enforceable" and any "liability . . . to make any payments on [it] expired by February 21, 2024." According to Spielbauer, there is "no rational reason" to base a restitution award on an expired judgment, and OCTC's request for an award of restitution constitutes an "improper . . . attempt to resurrect" the expired judgment.

Even were Spielbauer correct that the civil judgment is no longer enforceable — an issue on which we express no opinion[6] — his attempt to tie the propriety of a restitution

---

[6]  Regarding the civil judgment's alleged unenforceability, Spielbauer does not cite to evidence in the record but merely asserts in his supplemental brief that "[t]his Court can, and should, take judicial notice of the fact that the [j]udgment was never renewed."  It bears repeating that we "will not consider" a request for judicial notice "unless a party" complies with the California Rules of Court by filing and serving a separate motion requesting judicial notice and attaching to the motion copies of the matter to be noticed.  (*United Teachers of Los Angeles v. Los Angeles Unified School Dist.* (2012) 54 Cal.4th 504, 528; see Cal. Rules of Court, rules 8.520(g) ["[t]o obtain judicial notice by the

award to the judgment's enforceability fails under our precedents. In *Brookman, supra*, 46 Cal.3d at page 1009, we held that a restitution award was appropriate "even [though] the underlying subject of the restitution ha[d] previously been discharged in bankruptcy, and thus [could not] be collected as a debt as such." Applying *Brookman*, in *Bach, supra*, 52 Cal.3d at page 1206, we rejected an attorney's argument that an award of restitution would simply be "a means of enforcing [an] arbitrator's fee award to" the attorney's client for unearned fees, and that we had "no jurisdiction" to make such an award "because the arbitrator . . . lacked jurisdiction to adjudicate the fee dispute." The argument, we explained, was "frivolous" because it "fundamentally misapprehend[ed] the source and objective of [our] disciplinary jurisdiction over members of the State Bar. [¶] . . . This court does not sit in disciplinary matters as a collection board for clients aggrieved over fee matters; nor is our jurisdiction derivative of fee arbitration proceedings. The administration of attorney discipline, including such remedial orders as restitution, *is independent of any remedy that an aggrieved client may pursue*." (*Id.* at pp. 1206–1207, italics added.) Just three weeks before issuing *Bach* and consistent with its analysis, we stated in *Sorensen* that "restitution in this context" should be viewed not "as a 'damage award'" but as "a necessary condition of probation designed to effectuate petitioner's rehabilitation and to protect the public from similar future misconduct." (*Sorensen, supra*, 52 Cal.3d at p. 1044.)

_____

Supreme Court . . . a party must comply with rule 8.252(a)"], 8.252(a)(1) ["To obtain judicial notice by a reviewing court under Evidence Code section 459, a party must serve and file a separate motion with a proposed order"], (3) ["attach to the motion a copy of the matter to be noticed"].)

The Review Department's prior decisions are in accord with these precedents. In *In the Matter of Distefano* (Review Dept. 1991) 1 Cal. State Bar Ct. Rptr. 668, 674, the Review Department, citing *Brookman,* stated that "[r]estitution is not . . . limited to legally enforceable claims" and that attorneys "may therefore be required to make restitution as a moral obligation even when there is no legal obligation to do so." In *Petilla, supra,* 4 Cal. State Bar Ct. Rptr. at page 247, the Review Department applied *Brookman, Sorensen,* and *Distefano* to reject a disciplined attorney's argument that it was "illegal" to base a restitution award on unpaid cash advances constituting gambling debts that were "not enforceable" under California law. "[R]estitution in attorney disciplinary proceedings," the Review Department explained, "is not a form of debt collection," but "is an important part of rehabilitation and public protection because it forces errant attorneys to confront, in concrete terms, the harm that their misconduct has caused. [Citation.] Because the responsibilities of a lawyer differ from those of a lay[person], a lawyer may be required to make restitution as a moral obligation even when there is no legal obligation to do so." (*Id.* at p. 248.) Spielbauer's argument based on the alleged expiration of William LLC's civil judgment is fundamentally at odds with these precedents.

Likewise at odds with our precedents is Spielbauer's separate argument, in direct conflict with his assertion that the civil judgment is unenforceable, that an award of restitution would be improper because "the civil judgment provides for other processes for the LLC to obtain its payment of its judgment." As we explained in *Bach, supra,* 52 Cal.3d at page 1207, "[t]he administration of attorney discipline, *including such remedial orders as restitution, is independent of any remedy*

*that an aggrieved [victim] may pursue.*" (Italics added.)
Consistent with this principle, as earlier explained, we ordered
payment of restitution in *Morse*, *supra*, 11 Cal.4th at page 210,
even though doing so was "redundant of [a] superior court
judgment requiring restitution" that "already had imposed that
sanction." And as earlier noted, in *Slavkin*, *supra*, 49 Cal.3d at
page 906, we ordered that a disciplined attorney's actual
suspension continue "until" she paid restitution to a former
client for "the full amount of [a] judgment" the former client had
obtained in "[s]mall [c]laims [c]ourt," "plus interest at the legal
rate accruing on any unpaid balance from and after" the date of
the judgment's entry. (See *Lipson v. State Bar* (1991) 53 Cal.3d
1010, 1023 [actual suspension conditioned on payment of
restitution of amounts included in an "unsatisfied judgment
that the client recovered against" the attorney for failing to
repay a loan].)

Nor do any of Spielbauer's remaining arguments provide
a persuasive legal basis for declining to require restitution.
Spielbauer asserts that at the time he committed the acts
underlying this disciplinary matter, he "believed" his conduct
"was justified." The Review Department, giving collateral
estoppel effect to the superior court's findings in William LLC's
civil action, rejected this claim, finding that Spielbauer: (1)
"committed fraud within the meaning of Civil Code section 3294,
subdivision (a)" by "intentionally present[ing] an inaccurate
payoff demand, knowing it was false, to deprive William LLC of
its property"; and (2) made "an intentional misrepresentation"
to the superior court in the William LLC civil action by stating
in a filed declaration, under penalty of perjury, that the payoff
demand was " 'accurate' . . . when, in fact, [he] knew it was not,"
in order "to mislead the court and secure an advantage in

litigation." We denied Spielbauer's petition to review the Review Department's application of collateral estoppel, and we find Spielbauer's arguments on the issue, which merely repeat those he has previously made, to be unpersuasive.

Spielbauer next revives the argument from his July 2014 written response to OCTC's investigator that the "activities" giving rise to the civil judgment against him were not " 'committed in [his] professional capacity' " — i.e., "as an attorney" — but "as a President of" Devine Blessings. He asserts in his brief that he "was acting," "not . . . for the benefit of" William LLC "or any client," but only "for himself." Lawyers' Mutual relatedly argues that under *Kwasnik*, "the public interest in restitution is lessened" in this case because "Spielbauer's misconduct at least substantially fell outside his professional capacity as attorney." According to Lawyers' Mutual, "[i]t is undisputed that the precipitating event was a payoff demand Spielbauer issued as a business owner," and that act "did not require that he be an attorney or rely on his license to practice law." "Indeed," Lawyers' Mutual further asserts, "the hearing judge found that Spielbauer was *not* acting in a professional capacity when he presented the inaccurate payoff demand to the LLC and to the superior court," and "[t]he Review Department, in turn, found only that some of Spielbauer's misconduct — his submission of a declaration to the superior court — was 'related to the practice of law,' although it also noted that 'Spielbauer was not the primary attorney litigating the case.' "

The record, which we have a "duty to independently examine" (*Connor v. State Bar* (1990) 50 Cal.3d 1047, 1055), paints a different picture. To begin with, the hearing judge did not, as Lawyers' Mutual asserts, make an affirmative finding

"that Spielbauer was *not* acting in a professional capacity when he presented the inaccurate payoff demand." Instead, it declined to make a finding that he *was* acting in a professional capacity, reasoning in relevant part that OCTC "carrie[d] the burden" on this issue and the evidence was "inconclusive," with "some indication that Spielbauer was acting in his capacity as an attorney . . . and other evidence that he was not." Nor, contrary to the suggestion of Lawyers' Mutual, did the Review Department make a finding that "only . . . *some* of Spielbauer's misconduct — his submission of a declaration to the superior court — was 'related to the practice of law.'" Although the Review Department stated that it "consider[ed]" Spielbauer's submission to the trial court of a declaration containing an intentional misrepresentation to be "'related to the practice of law,'" it made no finding as to whether it considered any of Spielbauer's other misconduct — including issuing the knowingly false payoff demand in the first place — to be related to the practice of law.

More significantly, to the extent Spielbauer and Lawyers' Mutual are correct that the appropriateness of restitution depends on whether Spielbauer's misconduct was related to the practice of law — a point we do not address — the record contains clear and convincing evidence that it was. (See *In re Bradshaw* (2025) 17 Cal.5th 1095, 1107 [in disciplinary proceedings, OCTC has the burden "to prove culpability by clear and convincing evidence"].) First, regarding the payoff demand itself, Spielbauer's signature appears in the blank designated for Devine Blessings as "Beneficiary." His printed name appears on the next line, underneath "Devine Blessings" and beside the word "By," but the space for indicating the capacity in which he signed the document for Devine Blessings —

designated by the word "its" — is left blank. Thus, nothing in the document itself indicates that Spielbauer signed the document in his capacity as an officer or owner of Devine Blessings, rather than as counsel.

Next, when William LLC's counsel requested a revised payoff demand, Spielbauer sent a letter in reply on the letterhead of his law firm — "The Spielbauer Law Office" — stating that he was "responding . . . on behalf of Devine Blessings" and identifying himself on the typed signature line as "Thomas Spielbauer, Esq." The same day, he sent a second letter to William LLC's counsel also on the letterhead of "The Spielbauer Law Office" and identifying Spielbauer on the typed signature line as "Thomas Spielbauer, Esq."

Moreover, throughout the civil action, Spielbauer acted as counsel of record, first for Devine Blessings alone when it was the only named defendant, and then for both Devine Blessings and himself after William LLC, in an amended complaint, added Spielbauer as a named defendant. He was sole counsel for the first 15 months of that litigation — from July 2010 when William LLC filed the original complaint until October 2011, when he and Devine Blessings notified the court that they were "associat[ing]" another attorney "as counsel of record" to "be lead counsel." During those 15 months, Spielbauer signed and filed, among other things, multiple demurrers, motions to strike, and oppositions to William LLC's request for a preliminary injunction. Even after associating another attorney, and throughout the rest of the litigation, Spielbauer continued to sign and file pleadings as counsel for himself and Devine Blessings, including a cross-complaint in which he and Devine Blessings sued William LLC. On this record, insofar as Spielbauer and Lawyers' Mutual assert that restitution is not

appropriate unless Spielbauer's misconduct was related to the practice of law, we have no trouble finding that it was.

Spielbauer next argues that an award of restitution would be improper because William LLC suffered "no 'out of pocket' loss." He reasons as follows: Tort claimants seeking recovery of attorney fees "are not entitled to recover more money then [*sic*] actually paid." Thus, "[o]nly evidence of attorney fees actually paid [is] . . . admissible into evidence" in tort actions, and "no evidence was introduced" in the civil action that William LLC "or its principal actually paid its attorney any money, as opposed to granting its counsel a contingency fee for its services." "Disciplinary proceedings cannot be used to compel an attorney to pay bills for fees that are not even admissible in evidence in a court of general jurisdiction," and "no evidence was introduced in the State Bar Court regarding the attorney fees paid." Therefore, an award of restitution may not be based on William LLC's attorney fees in the civil action.

Spielbauer's argument is inconsistent with precedent. In *West Coast Development v. Reed* (1992) 2 Cal.App.4th 693, the Court of Appeal rejected the argument that an order pursuant to Code of Civil Procedure section 128.5 to pay the attorney fees "incurred by [a] party" as a result of frivolous or delay tactics was improper because "there was no showing that [the party] actually had paid the fees charged by" the attorney. (*West Coast Development*, at p. 707.) "[T]his argument," the court explained, "has no legal authority or reason to support it." (*Ibid.*) Although "[i]t is perhaps true that the payment of an attorney fee by a client may be some evidence that the fee was both due and reasonable," "the fact that a fee was not paid is no evidence that it has not been earned and that the client is not obligated to pay it." (*Ibid.*) Consistent with this decision, we reject Spielbauer's

argument that a restitution order here would be improper because "no evidence was introduced" in the civil action that William LLC "or its principal actually paid its attorney any money." The propriety of a disciplinary order requiring an attorney to pay restitution to a victim who has "incur[red] legal fees as a result of [the] attorney's" misconduct (*Sorensen, supra,* 52 Cal.3d at p. 1044) does not depend on whether the victim has yet paid the incurred fees.

The decision Spielbauer cites in support of his contrary argument — *Howell v. Hamilton Meats & Provisions, Inc.* (2011) 52 Cal.4th 541 (*Howell*) — is not inconsistent with the authority discussed above. *Howell* involved a principle that is not at issue here: the "collateral source rule," which precludes deducting from an injured person's damage recovery compensation the injured person received from sources independent of the tortfeasor. (*Id.* at p. 548.) The question before us in *Howell* was whether this rule applies where the plaintiff's medical provider, "pursuant to a preexisting contract with the [plaintiff's] health insurer," "accepts as full payment" for medical services a discounted amount that is "less than that stated in the provider's bill" to the plaintiff. (*Ibid.*) In holding that the rule does not apply in that context — and that such plaintiffs may not recover more than the discounted amount — we noted: (1) an earlier decision in which "we suggested . . . that the collateral source rule applies to unpaid services . . . rendered '*with the expectation of repayment out of any tort recovery*' "; (2) "the widely held view," "reflect[ed]" in the Restatement Second of Torts, "that the collateral source rule applies to gratuitous payments and services"; and (3) an appellate decision that, based on "other California cases, the law of sister states, and the policy of encouraging charitable action," had applied the

collateral source rule broadly to the provision of gratuitous services. (*Id.* at pp. 557–558, italics added.) We "neither approved nor disapproved" application of the collateral source rule in these contexts (*id.* at p. 558), finding them distinguishable. We concluded that reducing damages by collateral compensation that plaintiffs receive as a gift would produce "a windfall for" tortfeasors and that relieving them of the full cost of their negligence or wrongdoing would "distort" tort law's "deterrent function." (*Id.* at p. 560.) This principle arguably applies where a medical provider initially bills the plaintiff for its services but "later 'writes off'" all or part of its bill because of the plaintiff's inability to pay. (*Id.* at p. 559.) By contrast, where the medical provider "has agreed, before treating the plaintiff, to accept a certain amount in exchange for its services . . . [t]hat amount constitutes the provider's price," which the plaintiff is "obligated to pay without any writeoff." (*Ibid.*)

In this case, Spielbauer, who concedes in his briefing that the fee awarded in the civil action was "based on [actual] bills," points to no evidence in *any* relevant record — from the civil action, his bankruptcy action, or this disciplinary proceeding — suggesting that William LLC's attorneys in the civil matter, before providing legal services, agreed to accept in exchange for those services a lower amount than the amount billed. Nor, as far as our review of those records discloses, did Spielbauer assert in any of those proceedings — before he filed a supplemental brief in this court — that the amount billed was overstated, that William LLC was not obligated to pay the billed amount, or that

there can be no attorney fee award absent proof of actual payment.[7]

On the contrary, in his written closing argument to the hearing judge in this disciplinary matter, he characterized the "attorney fees" awarded in the civil action as "damages incurred by" William LLC. Earlier, in a letter to the State Bar explaining why he failed to report the civil judgment, he similarly characterized the "attorney fees awarded" in the civil action as "fees incurred," and he asserted that "[t]he only evidence received at the [civil] trial which pertained to attorney fees were those *paid to*" William LLC's counsel. (Italics added.) In his new trial motion in the civil action, he repeatedly referred to the fees in question as fees "incurred," and he asserted in his appeal in that action that "[a]ll of [those] fees *were spent* pursuing damage claims long after the April 27, 2010 [payment] demand had expired." (Italics added.)

Spielbauer's representations were fully consistent with both the superior court's decision in the civil action and *the evidence* submitted in that civil action. The superior court, in setting forth the damages that William LLC "proved" it had "suffered," stated: "Plaintiff submits proof that *it spent* $336,484.09 on fees in this case to eliminate the cloud on title caused by the false payoff demand." (Italics added.) In declarations submitted to the superior court, one of William LLC's attorneys stated under penalty of perjury that her "time

---

[7]   Spielbauer's argument about the absence of evidence of actual payment is, in addition to being unmeritorious, "untimely." (*Bercovich v. State Bar* (1990) 50 Cal.3d 116, 126; see *Blair v. State Bar* (1989) 49 Cal.3d 762, 774 [attorney forfeited argument that delay in instituting proceeding was a mitigating circumstance by failing to "raise[] any objection in the proceedings before the State Bar based on alleged delay"].)

*was billed* in this case at the rate of $395" per hour — discounted from her "standard billing rate [of] $450 per hour" — and another of William LLC's attorneys stated, also under penalty of perjury, "I have . . . *been billing* . . . William LLC at [the] rate of . . . $395 per hour," "reduced" from his "current billable rate for new clients [of] $425 per hour." (Italics added.)

Insofar as Spielbauer now speculates — contrary to the evidence just cited and without any evidentiary support — that William LLC's attorneys in the civil action may have agreed to work only for "a contingency fee," his view that this would make an award of restitution improper is not supported by *Howell*. As noted above, *Howell* acknowledged, and did not reject, an earlier decision of this court suggesting "the collateral source rule applies to unpaid services . . . rendered 'with the expectation of repayment out of any tort recovery.' " (*Howell, supra,* 52 Cal.4th at p. 558.) On the facts of this case, refusing to award restitution based on the asserted absence of evidence in the record that William LLC actually paid the attorney fees would, in the words of *Howell*, "result in a windfall for" Spielbauer and "distort the deterrent function of" restitution in the discipline context by providing him relief from the financial "cost of his . . . wrongdoing." (*Id.* at p. 560.)

Spielbauer's secondary argument regarding the asserted absence of out-of-pocket losses is also unpersuasive. According to Spielbauer, William LLC actually "made substantially more money" as a result of his actions — issuing a payment demand that "compelled" William LLC "to keep the property" and to sue to clear the resulting cloud on title — because "during the litigation," William LLC "retained all the rents on the property" and the property's value "appreciated substantially." However, the record is devoid of any evidence to support Spielbauer's

assertions. Moreover, given the substantial litigation costs associated with clearing the cloud on title, as discussed above, Spielbauer's argument about the absence of out-of-pocket losses fails even if, as he asserts, William LLC made money "by being compelled to keep the property" during that litigation. Under California law, "the expense of clearing title is a proper element of damages in [a slander of title] action." (*Glass v. Gulf Oil Corp.* (1970) 12 Cal.App.3d 412, 438; see *Sumner Hill Homeowners' Assn., Inc. v. Rio Mesa Holdings, LLC* (2012) 205 Cal.App.4th 999, 1030–1031; *Seeley v. Seymour* (1987) 190 Cal.App.3d 844, 865*; Hill v. Allan* (1968) 259 Cal.App.2d 470, 489.)

Finally, Spielbauer asserts that he "does not" — and "did not" — "have the ability to pay the $869,276.55 judgment." In support of his assertion, he cites his numerous representations to the hearing judge that he lacked funds to pay the judgment.

These self-serving assertions, considered in light of the record of all the related proceedings in this case, are an insufficient basis for declining to order payment of any restitution. In the civil action, the superior court discussed Spielbauer's financial situation at length as part of setting the amount of the punitive damages award. According to its statement of decision: The only evidence Spielbauer submitted on the subject in the civil action was his own testimony, and that testimony was "not . . . credible." Spielbauer "was evasive in his answers, even to very straightforward questions," and he "refused to answer" questions even after the court overruled his objections. Although he "claim[ed] he own[ed] no interest in any real property," "other evidence suggest[ed] he ha[d] control over real property assets and ha[d] used them as his own, actually converting value to his own use." Although he made an "assertion" about the level of his monthly income, he "provided

no means to test [his] assertion" and "bank statements show[ed] monthly transactions consistently in excess of [the asserted] amount, in some months very substantially in excess." During discovery, he "withheld responsive information," "refused to disclose documentation of [his] financial condition," and "extensively redacted" documents he produced without claiming that "redaction was authorized by any [court] order." By "fail[ing] to produce accurate and complete financial information," he " 'improperly deprived plaintiff of the opportunity to meet [its] burden of proof on the issue' " regarding his financial condition. Given his failure to provide "accurate indications of [his] ability to pay," a punitive damages award "approximately equivalent to the amount of compensatory damages" was "appropriate to accomplish the goals of punishment and protection and [was] not disproportionate to [his] ability to pay."

The Court of Appeals affirmed the punitive damages award. It found that "the trial court did not err" by "infer[ring]," "[b]ased on the evidence presented during the hearing on punitive damages," that Spielbauer had been "deceptive, had withheld complete documentation of [his] finances, and had more assets than [he] claimed." "Therefore," the appellate court continued, "we cannot conclude . . . the punitive damages award was so disproportionate to [Spielbauer's] wealth to render it excessive, exceeding what was necessary to properly punish and deter." "[T]he award," the court went on to state affirmatively, "was not disproportionate compared to [Spielbauer's] ability to pay." Consistent with these findings, the hearing judge, after noting that Spielbauer "made a bare remark at trial that he was unable to" pay the civil judgment, found that "the record contains no documentary evidence to justify [Spielbauer's]

failure to pay even a modest amount." Given this record, Spielbauer's self-serving testimony before the hearing judge that he did not have the money to pay the civil judgment is not a convincing basis for declining to award restitution. (See *Galardi*, *supra*, 43 Cal.3d at p. 694 [ordering payment of restitution as a condition of disciplinary suspension notwithstanding "concerns regarding [the attorney's] ability to" pay].)

## C. The terms of the restitution award.

We now turn to the terms of the restitution award. Regarding the six-month period of actual suspension that the Review Department recommended, OCTC asserts that we should further order that Spielbauer "remain suspended until he pays restitution for specific, out-of-pocket losses (compensatory damages, attorney fees and costs) in the amount of $536,726.49, plus interest." It argues as follows: "[T]his case involves intentional acts of dishonesty. [Spielbauer] breached his duty of good faith and fair dealing to those with whom he was transacting business, causing an innocent victim to suffer a tangible pecuniary loss; and, when the victim was forced to seek judicial intervention to clear the slander of title caused by [Spielbauer's] fraudulently inflated payoff demand, [Spielbauer] dragged out the litigation, submitted a false declaration stating that the payoff demand was accurate, and breached his duty of candor to the court."

Spielbauer offers little in response to OCTC's discussion. Many of his arguments — the judgment has expired and is unenforceable; he believed he was justified in his conduct; William LLC was never his client and he owed it no fiduciary duties; William LLC had no out-of-pocket losses and actually made money as a result of his actions — have been earlier

addressed and rejected. Regarding the Review Department's finding that he made "an intentional misrepresentation" to the court in the civil action, Spielbauer continues to deny all culpability, emphasizing that the "verification" in the declaration he submitted "contain[ed] the word[] 'belief' " — i.e., " 'to the best of my knowledge, information and belief' " — and that he "*believed* he was justified in his conduct at the time." (Italics added.) Beyond that, he blames others — including the victim of his conduct, William LLC — for William LLC's costs in the civil action. In this regard, he asserts: (1) William LLC and the Yazdanis "were not 'innocent victims,' " but obtained Dennis Spielbauer's properties through foreclosure "with peppercorn bids"; (2) William LLC prolonged resolution of the matter and "inflated [its] attorney fees and costs" by pursuing a slander of title claim when it could have brought "a declaratory judgment action" regarding the amount of the payoff demand; and (3) the "large judgment" resulted, not from his own " 'egregious behavior' " in "submitting an excessive payoff demand," but from his trial counsel's "erroneous advice" to "refuse[] to provide an accounting [that] described the basis of his [payoff] demand." Finally, he asserts that his conduct, which "happened well over 14 years ago," "is not likely to recur" because, among other things, he will "be far more circumspect about his conduct in the future."

These arguments are well answered by the comments of both the hearing judge and the Review Department in concluding that Spielbauer's "indifference" to the nature and consequences of his misconduct merit "substantial weight" as an aggravating factor. In a written decision, the hearing judge, who personally observed Spielbauer testify, stated: "Spielbauer fails to recognize the magnitude of his transgressions or accept

responsibility for them, continuing to insist . . . that his payoff demand statement was accurate and 'justified,' " "even though" his arguments "were unequivocally rejected by the superior and appellate courts in" the civil action and "this court granted collateral estoppel on the very issue of whether Spielbauer intentionally proffered an inaccurate payoff demand statement." He "insists that the superior court's findings were wrong because [that] court never saw" key "exculpatory evidence" — the "modification agreement" that allegedly "establish[es]" justification for his payoff demand — but, as he himself has "admitted," "it was his choice to withhold that document from the courts for his own purposes." His "attitude during the disciplinary proceeding reveals an absence of remorse and understanding of his ethical responsibilities as an attorney. Substantial weight is assigned to his lack of insight *as it makes him an ongoing danger to the public and legal profession*." (Italics added.)

The Review Department, like the hearing judge, found that "Spielbauer is unable to recognize the wrongfulness of his misconduct." He has not "accept[ed] responsibility for [his] wrongful acts and come to grips with [his] culpability," "which demonstrates his lack of insight. Despite the superior court's civil fraud judgment, [he] maintains that his actions were supported under the law, and he has done nothing wrong." "[H]is conduct goes beyond" proper defense of his actions and "reveal[s] a complete failure to understand the wrongfulness of his actions regarding the fraudulent payoff demand. Particularly troubling is his continued attempt . . . to relitigate the findings of the superior court [in the civil action], which were affirmed by the Court of Appeal and are fully supported by the record. [Citation.] [His] actions show indifference to the nature

and consequences of his misconduct." "His failure to understand the wrongfulness of his misconduct, underscored by his attempts to relitigate a fully adjudicated proceeding, is of particular concern that similar misconduct may recur and calls for strong preventive measures."

In this court, Spielbauer continues to demonstrate indifference to the nature and consequences of his actions, a refusal to take responsibility for those actions, and a lack of insight and remorse. He has doubled-down on the same excuses and explanations that have been rejected by every tribunal to consider them, and he has continued to blame others — including his victim, William LLC — for the predicament in which his own actions have left him. And he attempts to turn his own failure to make any payment on the civil judgment for over a decade — since entry of the civil judgment in 2014 — into yet another argument for avoiding responsibility: purported expiration of the civil judgment due to William LLC's failure to renew it.

On this record, we agree with the hearing judge that Spielbauer's "lack of insight . . . makes him an ongoing danger to the public and legal profession." We also agree with the Review Department that Spielbauer's "failure to understand the wrongfulness of his misconduct" gives rise to "concern that similar misconduct may recur and calls for strong preventive measures." Spielbauer's misconduct was not garden-variety civil misbehavior, but was fraudulent activity, which raises questions about his ability to represent clients in a manner consistent with his professional obligations. Like OCTC, we therefore find that Spielbauer should be required to pay restitution in the amount of $536,726.55, plus interest, which reflects William LLC's damages and the out-of-pocket costs it

incurred in the civil action as a result of Spielbauer's misconduct.[8] Given all the circumstances, we find this level of discipline appropriate to protect the public.

Nevertheless, we are mindful of the hearing judge's concern about the potential "impact on [Spielbauer's] ability to practice" of requiring him to pay *the entire amount* of restitution "prior to returning to active status." We have previously noted similar concerns in fashioning the terms of restitution. For example, in *Beery v. State Bar* (1987) 43 Cal.3d 802, 816, after finding that a restitution requirement "in the amount of $35,000" was "appropriate" given the facts of the case, we declined to require "completion of restitution . . . during the period of actual suspension" given "the financial hardship [that actual] suspension [was] likely to cause." "It will be sufficient," we concluded, that "restitution is made a condition of probation" (*ibid.*), and we included as a probation condition that the attorney make "restitution according to a payment program approved by the State Bar Court" (*id.* at p. 817).

*Galardi* is also relevant on this issue. There, the Review Department's recommended discipline included "actual suspension for at least one year and until [the attorney paid] restitution totaling $186,000 to his joint venturers." (*Galardi, supra*, 43 Cal.3d at p. 687.) Based on the attorney's personal circumstances — he "ha[d] gone through bankruptcy liquidation

---

[8]   The amount OCTC requested — $536,726.49 — appears to be off by six cents. As earlier noted, the judgment, exclusive of punitive damages, included $332,547.06 in compensatory damages, $163,597.12 in attorney fees, and $40,582.37 in costs, which totals $536,726.55. The State Bar expressly does not seek punitive damages "as part of [the] restitution condition" and, for that reason, OCTC declines to discuss them in its briefing. For the same reason, we decline to discuss them.

proceedings" — we found it "unlikely" he "would be able to comply with the restitution requirement . . . were [he] unable to practice law," and we expressed "concern[]" that actual suspension "*until* he repa[id]" the entire amount therefore "would prevent him from ever returning to the practice of law." (*Id.* at p. 694.) It was nevertheless "reasonable," we concluded, "to expect" that he could "repay" all the money he owed "within five years." (*Ibid.*) Therefore, along with actual suspension for the first 30 days of a five-year probationary term, we ordered the attorney to pay "one-fifth of the [total amount of] restitution . . . each year for the next five years, with the first installment[] due one year after [our] decision [became] final and the remaining installments due on the same date in each subsequent year during the five-year probationary period." (*Id.* at pp. 694–695.)

Our decisions reveal still other approaches regarding ability to pay restitution. In *Prantil v. State Bar* (1979) 23 Cal.3d 243, 245, we ordered payment of the total restitution amount — $4,500 plus interest — "in monthly installments of $200 or more," and we specified that "the stay of execution of the suspension order [would] be lifted if [the attorney] misse[d] two consecutive payments." In several cases, we have ordered payment within a specified period of time that was more than the period of actual suspension but less than or coextensive with the length of the probationary term. (*Lipson v. State Bar*, *supra*, 53 Cal.3d at p. 1023 [actual suspension for two years and payment of restitution "within the five-year probationary period"]; *Coppock, supra*, 44 Cal.3d at p. 687 [actual suspension for 90 days and payment of restitution "within the first year" of two-year probationary period]; *Waysman v. State Bar* (1986) 41 Cal.3d 452, 459 [no actual suspension, "complete restitution" to

be "made by the end of the one-year probationary period," and if not paid within one year, probation extended "for another two years or until restitution is made in full, whichever comes first"]; *Demain v. State Bar* (1970) 3 Cal.3d 381, 383 [actual suspension for six months and payment of restitution "within the first two years" of five-year probationary period].)

In *Morse*, we took yet another approach. The time period we specified for payment of $350,000 in restitution and civil penalties — "within the first 90 days of" a five-year probationary period — was much shorter than the three-year actual suspension we imposed. (*Morse*, *supra*, 11 Cal.4th at p. 212.) However, we went on to set forth a detailed procedure for seeking an extension if the attorney "contend[ed]" he was "unable to pay this amount" by the 90-day deadline: He "must submit to his probation monitor within the first 90 days of the probation period a written plan for prompt payment of as much of the amount as [he] is able to pay. The submission of any such plan . . . must include satisfactory proof of [his] financial condition and the amount he is able to pay. The State Bar Court is authorized to review de novo any decision by the monitor either to approve or to reject any payment plan proposed by [the attorney]. If, within two years, [he] pays in full the [entire amount] . . . he shall be entitled to have the State Bar Court reduce the period of actual suspension from three years to two years." (*Ibid.*)

In *Petilla*, the Review Department, citing *Morse*, took a similar approach. After recommending actual suspension for 60 days and a restitution payment of approximately $12,000 plus interest "[w]ithin 90 days after the effective date of the Supreme Court order in this matter," the Review Department added: "If Petilla contends that he is unable to pay this amount, he must

(1) ask, within the first 30 days after the effective date of the Supreme Court order in this matter, the State Bar's Probation Unit in Los Angeles to assign to him a probation monitor referee and (2) submit to that referee, within 30 days after being notified of the referee's assignment, a written plan for the prompt payment of as much of the amount as he is able to pay. The submission of any such plan by Petilla must include satisfactory proof of his financial condition and the amount he is able to pay. On the motion of Petilla or the State Bar, any decision by the referee to approve or reject any payment plan proposed by Petilla is subject to de novo review by the State Bar Court." (*Petilla*, *supra*, 4 Cal. State Bar Ct. Rptr. at p. 251.)

Considering all the circumstances in this case, we conclude that an approach modeled on *Morse* and *Petilla* is appropriate and would best promote the goals of restitution: "to effectuate [Spielbauer's] rehabilitation and to protect the public from similar future misconduct." (*Sorensen*, *supra*, 52 Cal.3d at p. 1044.) On the one hand, the amount of restitution — over $500,000, plus interest — is substantial and, as the hearing judge observed, requiring Spielbauer to pay the entire amount "prior to returning to active status" could significantly "impact" his "ability to practice." On the other hand, the judgment in the civil action was entered over 12 years ago — in February 2014 — and Spielbauer has made no payments on it during that period even though it was affirmed on appeal and we declined to review it in 2016, the bankruptcy court found it nondischargeable in 2017, and that decision was affirmed in 2018 by a federal district court and again in 2019 by the Ninth Circuit Court of Appeals. Nor, in this disciplinary proceeding, has Spielbauer shown any inclination or willingness to pay what he owes, or even the smallest portion of what he owes.

Moreover, regarding his ability to pay, he thwarted the efforts of William LLC and the superior court in the civil action to determine his financial condition, and he has offered no evidence on the subject in these disciplinary proceedings other than brief, conclusory, self-serving statements during his testimony.

## III. DISPOSITION

Based on the above, we order that Thomas John Spielbauer, State Bar No. 78281, be suspended from the practice of law for two years, that execution of that suspension be stayed as set forth below, and that he be placed on probation for two years with the following conditions:

1. Spielbauer must be actually suspended from the practice of law for the first six months of his probation and until he makes restitution to William LLC in the amount of $536,726.55 plus interest at the legal rate per annum dating from February 14, 2014 (the date the superior court rendered judgment) and presents satisfactory proof thereof to the State Bar. If he contends he is unable to pay this amount within the first six months of his probation period, he must submit to his assigned probation case coordinator within the first 90 days of the probation period a written plan for prompt payment of as much of the amount as he is able to pay. Along with the plan, he must submit satisfactory proof of his financial condition and the amount he is able to pay. The State Bar Court is authorized to review de novo any decision by the probation case coordinator either to approve or to reject any payment plan Spielbauer proposes. If Spielbauer adequately demonstrates his inability to pay, obtains approval of a repayment plan, and makes

payments consistent with that repayment plan, then he may be reinstated before making full restitution.

Spielbauer's failure to submit, within the first 90 days of the probation period, both (1) a written plan for prompt payment of as much of the amount as he is able to pay and (2) satisfactory proof of his financial condition and the amount he is able to pay, shall constitute a forfeiture of any option to request or have a payment plan, such that he is bound to pay the full amount of restitution before being reinstated. The probation case coordinator shall have discretion to grant relief from the forfeiture upon a showing by Spielbauer of good cause, subject to the State Bar Court's de novo review of any decision by the probation case coordinator regarding relief from default. If Spielbauer has not obtained approval of a payment plan within the first six months of his probation period, his actual suspension will continue until a payment plan is approved.

Payments Spielbauer makes on the civil judgment, excluding payments to satisfy the punitive damages component of that judgment, shall be credited toward his restitution obligation under this order. Likewise, any restitution payments he makes pursuant to this order shall be credited toward the civil judgment.

2. Spielbauer must comply with all other conditions of probation recommended by the Review Department, as set out in its decision filed October 25, 2023 (as modified on October 27, 2023).

It is also ordered that:

1.  Spielbauer take and pass the Multistate Professional Responsibility Examination (MPRE) administered by the National Conference of Bar Examiners within one year after the effective date of this order and provide satisfactory proof of such passage to the State Bar's Office of Probation within the same period.  Failure to do so may result in additional suspension. (Cal. Rules of Court, rule 9.10(b).)  If he provides satisfactory evidence of completion of taking and passage of the MPRE after the date of the State Bar Review Department opinion but before the effective date of this order, he will receive credit toward his duty to comply with this condition.

2.  Spielbauer must comply with California Rules of Court, rule 9.20, and perform the acts specified in (a) and (c) of that rule within 30 and 40 calendar days, respectively, after the effective date of this order.  (*Athearn v. State Bar* (1982) 32 Cal.3d 38, 45 [the operative date for identification of clients being represented in pending matters and others to be notified is the filing date of the Supreme Court order imposing discipline].)  Failure to do so may result in disbarment or additional suspension.  He must file a rule 9.20(c) affidavit even if he has no clients to notify on the date this order is filed.

3.  Costs are awarded to the State Bar in accordance with Business and Professions Code section 6086.10, and are enforceable both as provided in Business and Professions Code section 6140.7 and as a money judgment.  Unless time for payment of discipline costs is extended pursuant to Business and Professions Code section 6086.10, subdivision (c), costs assessed against an attorney who is actually suspended or

disbarred must be paid as a condition of reinstatement or return to active status.

**EVANS, J.**

**We Concur:**

**GUERRERO, C. J.**
**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**
**GROBAN, J.**
**CASTILLO, J.**[*]

---

[*]    Associate Justice of the Court of Appeal, Fourth Appellate District, Division One, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  In re Spielbauer

_____

**Procedural Posture** (see XX below)
**Original Appeal**
**Original Proceeding** XX
**Review Granted (published)**
**Review Granted (unpublished)**
**Rehearing Granted**

_____

**Opinion No.** S283172
**Date Filed:** July 16, 2026

_____

**Court:**
**County:**
**Judge:**

_____

**Counsel:**

Moss & Murphy and Glen L. Moss for Petitioner.

Horvitz & Levy, Steven S. Fleischman, John B. Sprangers and Beth J. Jay for Lawyers' Mutual Insurance Company as Amicus Curiae on behalf of Petitioner.

Ellin Davtyan, Brady R. Dewar, George S. Cardona, Christopher G. Jagard and Rachel S. Grunberg for Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Glen L. Moss
Moss & Murphy
1297 B Street
Hayward, CA 94541
(510) 583-1155

John B. Sprangers
3601 West Olive Avenue, 8th Floor
Burbank, CA 91505
(818) 995-0800

Rachel S. Grunberg
State Bar of California Office of Chief Counsel
180 Howard Street
San Francisco, CA 94105
(415) 538-2196